**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
|     **upon the relation and** | ) | |
|     **for the use of** | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:07-cv-00485** |
| | ) | |
| **AN EASEMENT AND RIGHT-OF-WAY** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **OVER A TOTAL OF 2.11 ACRES OF** | ) | |
| **LAND, MORE OR LESS, IN** | ) | |
| **WILLIAMSON COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **RONALD WINDROW, and** | ) | |
| **SHERRY WINDROW,** | ) | |
| | ) | |
|     **Defendants.** | ) | |

## REPORT OF THE COMMISSION

This commission appointed pursuant to Administrative Order number 75 of this court and Rule 71A(h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

1.      The Notice and Amended Complaint in this cause, with property description, were filed May 3, 2007. The orders of possession, the investment orders and the orders of appointing commissioners were entered May 3, 2007. It was stipulated by the parties that the date of taking of this case was May 3, 2007.

2.      On April 8, 2010, the commission met with the parties, their counsel and expert witnesses for a view of the property at the Windrow tract.

3.     The trial of this matter commenced on April 9, 2010 at the offices of Jones, Hawkins and Farmer in Nashville, Tennessee.

4.     The take is in one section as it crosses the Windrow property comprising 2.11 acres, more or less, and also including guy wire rights.   The easement is designated as MFTCC-39 comprising 8.62 acres +/- on the plan and profile map which is part of the Radnor-Triune Transmission Line Tap to Clovercroft, a substation of the Middle Tennessee Electric Membership Corporation (MTEMC).   Exhibit 1 is a full size copy of the plan and profile map. It describes the underlying easement as well as provides a physical description of the power lines and topography of the land.   It specifically lists the types of poles and structures which are on the easements described, including guy wire rights and the presence of guy wires.

5.     The following facts were stipulated:

A.  The date of taking was May 3, 2007.

B.  The acreage of the easement was 2.11  acres.

C.  The acreage of the subject is approximately 30.79 acres.

D.  The area east of the  right-of-way (between the right-of-way and the boundary) is 1.65 acres, and it  is damaged to some extent.

E.  Middle Tennessee Electric   Membership Corporation (MTEMC)   acquired the substation site   that is to the north and the east of the subject   property in the Circuit Court of Williamson County, in condemnation from Robert and Shirley Yeats on May 26, 2005.

F.  The subject  property currently contains two houses.

G.  The houses have not lost value by virtue of the taking. The land has lost value.

2

H. The line is a 161 kV line with three conductors and an aerial ground wire. The guy wires run from a two-pole structure owned by Tennessee Valley Authority on MTEMC's substation site to the north and east of the subject property.

6.    Exhibits admitted at the hearing were as follows:

Exhibit 1   Plan and Profile Map;

Exhibit 2   Power contract between TVA and MTEMC dated July 1, 1976;

Exhibit 3   Schedule of terms and Conditions;

Exhibit 4   New Delivery Point Agreement between MTEMC and TVA, dated October 14, 2005;

Exhibit 5   Terms and Conditions (New Delivery Point);

Exhibit 6   E-mail from Tom Suggs to Thomas Cureton, dated April 7, 2005 re: Nolensville Substation Location;

Exhibit 7   E-mail from Thomas Cathcart to K. Scot Eaves dated June 7, 2005 re: Nolensville scoping scheduling;

Exhibit 8   Consent Judgment, MTEMC v. Yates, No. 05254, Williamson County Circuit Court, dated May 26, 2005;

Exhibit 9   Engineering drawing of substation;

Exhibit 10  Appraisal Report of S. Todd Rogers as of May 3, 2007

Exhibit 11  Photograph of power pole

Exhibit 12  Aerial photograph of area of take

Exhibit 13  Plat of Bent Creek Subdivision

Exhibit 14  Photographs of area of substation dated March 13, 2007

Exhibit 15  Appraisal Report of Norman Hall as of May 3, 2007

3

Exhibit 16  Gary Standifer market data analysis

Exhibit 17 Gary Standifer review of S. Todd Rogers Report

Exhibit 18 Excerpt from Appraisal Journal, Winter 2010

Exhibit 19 Restricted Use Appraisal Report Contract between TVA and   Gary
Standifer dated March 13, 2007

7.      This case involved the acquisition of rights over an easement and right of way over 2.11 acres of land, more or less, in Williamson County, Tennessee.  The total size of the tract from which the easement is taken is approximately 30.79 acres.  The parcel can be seen in the plan and profile maps and in the various expert reports.  The Commission also walked over a large area of the parcel and the adjoining MTEMC Clovercroft substation with the parties. The rights taken are more particularly described in the Declaration of Taking which is of record in this case as well as in the Plan and Profile Map, Exhibit 1.  The land taken and the easement is dedicated by the Tennessee Valley Authority as tract number MFTCC-39 on the Radnor-Triune Transmission Line Tap to Clovercroft. The easement is  one hundred (100) feet wide. The easement crosses the property approximately from south southeast  to north northwest at the eastern side of the property. It adjoins the Middle Tennessee Electric Membership Corporation Clovercroft Substation. At the time of the hearing the power line had been constructed. The power line has 161,000 volts.

8.      The  landowner called Thomas Suggs, a vice president of engineering with MTEMC. He was asked about a series of exhibits concerning the agreements between MTEMC and TVA and the placement of the Clovercroft Substation. (Tr. pp. 20-23) Proposed site C. was actually bought and used as the substation. (Tr. p. 24)  TVA

4

supplied power to MTEMC to sell to consumers. (Tr. pp. 27-29) TVA could transmit power along MTEMC lines when available. (Tr. pp. 30-31) TVA was to construct a power line to go across the landowner's property to a tap point on the MTEMC substation. (Tr. p. 36) TVA energized the power line to the MTEMC substation on February 27, 2008 (Tr. p. 39) TVA had to approve the site for MTEMC to place the substation there. (Tr. p. 44) Mr. Suggs was cross examined by the Government. MTEMC had acquired the property and then told TVA which property it was. (Tr. p. 47) The property was acquired through a friendly condemnation evidenced in Exhibit 8. which is a consent judgment. (Tr. p. 48) TVA was informed of and approved three possible sites, one of which MTEMC picked. (Tr. p. 50) TVA owns equipment on the MTEMC site but does not own any rights in the land. (Tr. pp. 54-55) On Re-Direct Mr. Suggs indicated that TVA comes onto the substation property to maintain their equipment. (Tr. p. 62) TVA was not involved in substation construction. (Tr. p. 64)

9.      Steven Todd Rogers was called as an expert appraiser and allowed to express opinions by stipulation (Tr. p. 66) Nolensville town officials told him the Windrow property was within the urban growth boundary of Nolensville. It would likely be developed as a conventional subdivision. (Tr. pp. 75-76) The highest and best use was for conventional residential subdivision development with approximately one acre lots. (Tr. p. 77) No portion of the space taken could be used for open space. (Tr. p. 78) There was not a dispute as to residential development being the highest and best use. (Tr. pp. 77-78) Sewer is available. (Ibid.) Water is available. (Tr. p. 79) There is a two pole structure at station 277 plus 78.5 which is supposed to be within the substation boundary. (Tr. p. 85) The actual poles are not supposed to be on the subject

but their guy wires which are attached are within the subject property. (Tr. p. 90) There is a discrepancy between the description of the plan and profile map as offered in the discussion with counsel and the actual pole placement. It was clear from the viewing and the photographs at pages 17 and 18 of Exhibit 10 that the actual pole placement of the two poles is at an angle to the property line as depicted by the two black dots on either side of station 277 plus 78.5. This is consistent with the depiction of actual pole placement in the rest of the plan and profile map. At least the guy wire parts of these poles and possibly the fill of one of the poles are within the easement. (See Exhibit 1. inserted drawing of substation) In the colloquy about this issue, Mr. Hall, TVA's appraiser, volunteered that one of the two poles at the substation was in the easement. (Tr. pp. 95-97)

10.      Mr. Rogers indicated he reviewed twenty-one comparable properties, nine of which were assemblages (Tr. pp. 99-100), twelve comparables were not assemblages (Tr. p. 99)  On the assemblages the sales were an aggregate sum. (Tr. p. 101) Based on his comparable sales he opined that the per acre value of the subject property was $36,000 per acre. (Tr. p. 103) He looked at Stonebridge Park and Horseshoe Bend for subdivisions affected by TVA power lines. (Tr. pp. 110-111) Pursuant to questions from the Commission he stated that his opinion of highest and best use was conventional residential subdivision. The value of the land before the take was $1,108,440. His opinion of the value of the property after the imposition of the easement was $744,180. He included $107,100 for the impact of the substation. The 1.65 acres to the east was damaged $59,400. He damaged it all at 100%.  He damaged 3.357 acres abutting the substation to a depth of 250 feet at $30,000 per acre. No part

6

was in the flood plain. There is a sewer across the street in a creek bed. (Tr. pp. 112-117) He found damage to a 250 wide area west of the easement, comprising 6.09 acres, of $121,800. (Tr. p. 119) Regarding the subdivisions and the depth of his area outside the easement he found the properties directly abutting the easement, directly adjacent to it, or within some direct view of it tended to have lower prices. He felt it appropriate to apply this damage only to the first lot along the subject easement. And being that the highest and best use was for acre lots he applied an appropriate depth for those acre lots of 250 feet, a fairly typical depth in his opinion. (Tr. p. 126). The reason for his hundred percent damage figure was the highest and best use, i.e., the property could not be used for that after the take. (Tr. p. 132) He felt it had no utility to a typical buyer. (Tr. p. 133)

11.     On cross examination he was asked about how many properties would have to be crossed to get sewer to the subject from Bent Creek and stated it would be two or three depending on where the connection was. (Tr. p. 139) Property that was going to be developed would be in the city of Nolensville once sewer was developed. (Tr. pp. 144-145) His reports had three editions, with the last one containing the change from a $40,000 per acre value to $36,000 based on the elimination of the comparable which was based on a sale that did not happen. (Tr. p. 149) His closest comparable sale was on the corner of Burke Hollow road. (Tr. p. 153) He wasn't sure whether he considered a sale at the corner of Williams Road and Clovercroft that occurred on April 13, 2007. (Tr. p. 157) His sales numbered 3, 4, 7, 15, 16, 17, 18, and 19 were assemblage sales. (Tr. pp. 158-159) The first sale next to the subject was also used as a comparable by Norman Hall. (Tr. p. 160)     Some comparable sales were as far as

7

eight miles away. (Tr. p. 162) He could not say the average price of assemblages had not been driven up by the last sale in them. (Tr. p. 169)     He did not have a comparative analysis using a quantitative method. (Tr. p. 173) He got to his per acre value of $36,000 using a qualitative adjustment. (Tr. pp. 174-175) His after value for the subject did include damage from the presence of the substation. (Tr. p. 179) Multiple towers were in the Stonebridge development. (Tr. p. 185) He was questioned at length about the number of lines on his studies and the number of lines close to the subject as well as the width of easements. (Tr. pp. 188-192) He did not rely on Horseshoe bend for damage to the subject. (Tr. p. 194) Developers do not want to run a street with houses on only one side. (Tr. p. 195-96) He used a lot depth of 200 to 250 feet for his damages because of lot sizes. (Tr. p. 198) His damages were based on a before and after value of the easement. (Tr. p. 201)  One of the reasons he did not use the Hall comparable at Williams Road and Clovercroft because it was only 6.75 acres. (Tr. pp. 203-204) There was no skew to his values because of using assemblages. (Tr. p. 204) He used qualitative adjustments. (Tr. p. 206) He considered differences in physical attributes, zoning, utilities, etc. (Tr. p. 206) On recross he admitted he did not leave the  Hall comparable off just because of size but it affected it negatively. (Tr. p. 212)

12.     He was asked by the Commission about his comparable 11. and a Hall comparable sale  on the same date. He indicated they were all included in the Hall comparables. (Tr. p. 218)

13.     Sherry Windrow, one of the property owners was called as a landowner witness. She said blasting was going on across the road. (Tr. p. 219)

8

14.     Ronald Windrow, one of the property owners was called as a landowner witness. He said the fence at the back of the substation was the property line and anything outside of it was on his land. One of the poles of the two pole structure at the substation was on his land. (Tr. p. 221) His property is two miles from the Brentwood city limits. (Ibid.)

15.     Norman Hall was called as an expert appraiser witness by the government. His qualifications as an expert and his ability to express an opinion as to value were stipulated to. His report was entered into evidence and marked as Exhibit 15. He went to the property and inspected it, he interviewed the landowners, he reviewed sales, checked zoning, considered highest and best use, and determined highest and best use was residential development. He then determined the value of the land was $28,000 per acre, giving the most weight to his comparables one and two, i.e., the adjacent sale and the sale four hundred feet up the road and he also opined that the land would not perc. (Tr. pp. 225-227)

16.     The easement contained 2.11 acres valued at $59,080 which he damaged at eighty-five percent (85%) for a total of $50,200. He then added guy wire rights damage of $2,500 for a total damage of $52,700 to the easement itself. (Tr. p. 227) He considered the pole at the substation fence to be within the easement and included it in his damages. (Ibid.) He also damaged the 1.65 acre area to the east of the easement at fifty percent (50%) for incidental damages of $23,100. This yielded total damages from the take of $75,800. (Tr. p. 228) The substation could not be considered in the after situation but could be considered as a basis for the value before since it was a sale. (Tr. p. 229) On cross examination he said the lands in the

9

assemblage were bought by one person and brought about $27,300 per acre. (Tr. pp. 233-234) A 30.5 acre tract in that assemblage brought $36,065 per acre. (Ibid.) He felt the averaging process used by Rogers was not appropriate because it did not allow for consideration of individual properties for adjustment purposes. (Tr. pp. 235-236) The easement was consistent with residential use as it could be open space or roads. (Tr. p. 240) He had not heard about Nolensville officials being opposed to open space development. (Tr. p. 242) Long lots could be laid out across the easement. (Tr. p. 245) The first twelve Rogers sales were reasonable comparables and the others were too far away and it was not appropriate to do an average.  (Tr. p. 248) He had talked to officials with the Williamson County Planning Commission to whom zoning issues are directed. They were amenable to an open space development on the subject. (Tr. p. 252) He did not have an adjustment table for each comparable sale used. (Tr. p. 256) That process does not allow one to decide whether to take the higher or lower value. (Tr. p. 257) There was no way to tell which value was correct. It could be anywhere between 16,000 and 40,000. (Tr. pp. 257-258). Although he did not average, his value was close to what an average would be. (Tr. pp. 258-259) On redirect he indicated he had done qualitative adjustments. (Tr. p. 266) The York Road sale was close to the subject in size, i.e., 30.5 acres as compared to 30.79, and brought $36,000 per acre. (Tr. pp. 268-269)  However, the York Road property was part of an assemblage and had sewer next to it. (Tr. p.     271)

17.     Gary Standifer was called as a witness by the Government. He did not do an appraisal.  (Tr. pp. 283-286). The Landowner moved to strike his testimony. He has done six studies and looked at hundreds of remainder sales. (Tr. p. 294) He opines

10

they show no decrease in value per acre. (Ibid). A proposal for development in Williamson County would be more likely approved in the "conservation mode". (Tr. p. 297) He referenced an Appraisal Journal article, Exhibit 18. (Tr. p. 299) He opined that a methodology used in determining the effects of power lines called the retrospective appraisal based on control properties was an acceptable methodology. (Tr. p. 307) He felt there were no damages to the remainder to the west and there were fifty percent damages to the 1.65 acre section to the east based on the studies he reviewed. (Tr. pp. 307-308) The Rogers study of Stonebridge was not a sound conclusion. (Tr. p. 314) Rogers did not properly control his variables for cul de sacs. (Tr. p. 317) On cross there was a considerable discussion of the Appraisal Journal article and its responses with the general conclusion that, ""It is fair to presume that the direction of the effect would, in most circumstances, be negative, but the existence of a measurable effect and the magnitude of such effect can only be determined by empirical analysis of the actual market transaction." (Tr. p. 327) He further agreed that within the 200-foot boundary that was utilized, there were some properties that were not impacted and some properties that were visually impacted. (Tr. pp. 338-339) He agreed that if Nolensville annexed the subject property and did not want open space development then it would be their decision. (Tr. p. 341) On recross he was shown and admitted that he had done an appraisal (Exhibit 19) that was approximately $20,000 lower in damages than Mr. Hall's report. (Tr. p. 347) This was inconsistent with, in fact directly contradictory to, his earlier testimony that he had not done an appraisal on the property. (Tr. p. 348)

18.     Below is a table summarizing the opinions of the landowner and the appraisers. This summary is not the entirety of their opinions but lists the major relevant parts:

| Appraisers/ Landowner | Rogers | Hall |
|---|---|---|
| Highest and best use | Res. Devel. | Residential Devel. |
| Value per acre | 36,000/acre | 28,000/acre |
| Percent of damage | 100% easement Various% remndr. | 85%/easement 50%Traingle parcel |
| Damage to easement | 75,960 | 50,200 |
| Incidental damage | 1.65 acre 59,400 Buffer  121,800 Buffer/ss 107,100 | 2,500 guy wires 1.65 acre  23,100 |
| Property as a whole | 366,260 | 75,800 |
| Amount due owner | 366,500 rounded | 75,800 |

19.     The landowner appears to make somewhat of an inverse condemnation claim. His expert asserts  that a portion of the land has no value whatsoever, as if it were taken in fee simple, instead of an easement as the declaration calls for. His rationale is since the highest and best use is residential development, the land had no economic contribution as the developer could not economically use it as acre lots. He also attached damages from the construction of the substation by MTEMC and claimed it was a joint venture with TVA.

20.     There was much discussion and argument about  the viability of various "studies". The Commission was presented with no credible evidence that  these "studies" meet the standards of the relevant  profession, be it appraisal or statistics.

12

21.     The underlying value of the property was within a range of $28,000 per acre to $36,000 per acre, according to the appraisers.

22.     The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the property is taken by condemnation. See, *United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979).

23.     Expert testimony generally is reviewed based on the *Instructions to Commissioners*, 61 F.R.D. 503, 507 and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 588-89 (1993). The Commission notes that the Government's own expert, Mr. Hall, a former Chairman of the Tennessee Real Estate Appraisal Commission, has stated in the past that an appraiser was entitled to use his own opinion. In his own testimony and report he specifically avoids getting into a written tabular adjustment of values of various comparable sales and expresses his opinion about them.

24.     Generally a district court's decision to admit or not admit expert opinion and reports is reviewed on an abuse of discretion standard. See, *General Electric Co. v. Joiner*, 522 U.S. 136, 138, 118 S.Ct. 512, U.S.Ga. (1997). *General Electric v. Joiner*

13

was a jury case. Where the factual bases of a study are so dissimilar to the facts of the case at issue it is not an abuse of discretion for a trial court to reject the study. *General Electric, supra*, 522 U.S. at 144-145. "The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." See, *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 852 (6th Cir. 2004). As a general proposition the Commission gives far less weight to studies than it does to the actual comparable sales analysis and particulars of the property in question. The Commission has seen many truly enormous and basically unhelpful studies over the course of its hearings and here. The Commission has yet to see one that is truly valid or reliable. As a general rule, and here, the Commission lets the impact of the studies go to the weight given to them, rather than serve as a basis for accepting or rejecting outright a given expert's opinion. It is worth noting in this regard that both TVA's and the Landowner's experts found damage to the area outside the easement, they differed only as to its extent. TVA also attempted to have Mr. Standifer become an appraiser to express an opinion as to value. His "report" (Exhibit 19) only gives a value and a highest and best use. It lists no comparable sales. It does no other analysis. For this reason the Commission does not credit it or its opinion about value at all.

25.     Further, the *Instructions to Commissioners*, under which this Commission operates, 61 F.R.D. 503, 506 (E.D. Tenn. 1973, Judge Taylor), have an extensive discussion about the assessment of credibility and the weighing of the evidence. As Judge Taylor noted there, "Expert or opinion testimony is only as good as the facts and assumptions upon which it is based and if such testimony is without any support

14

in the demonstration and physical facts, it is worthless and may be disregarded....  In considering such testimony it is your duty to determine whether such opinion is correct or erroneous, and in arriving at your conclusion you should consider the manner and demeanor of the witness, the bias or lack of bias, the grounds upon which the witness based his opinion, his experience and knowledge of the matters about which he is  testifying, particularly his knowledge of the property, along with other evidence in the case, and the reasonableness or unreasonableness of his opinion as viewed in the light of the knowledge and experience of the witness."

26.     While the studies have been presented as exhibits there was little testimony or proof about how the studies came to be done, what questions they were addressing and generally the "methodology and explanatory power of the statistical analysis...". *Taylor v. Proctor and Gamble Company*, 178 F. 3d 1296, (Table), 1999 WL 232695 (C.A. 6 (Ohio)) citing, *Simpson v. Midland-Ross Corp.*, 823 F. 2d 937, 944 (6th Cir. 1987). As the *Taylor v. Proctor and Gamble* court stated," Statisticians working from the same corpus of data often disagree at trial on the statistical significance of data - based on collection techniques, sampling methods, groupings, calculations used, control variables, etc." *Ibid.*  Here the experts were clear that they did not control their variables. For a statistical study to "contribute anything of value" it is necessary that "the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." See *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 1765 (1987) citing *McCleskey v. Zant*, 580 F. Supp. 338, 353-360 (N.D. Ga. 1984). Based on the various cross examinations this was especially troubling to the Commission since there was little, if

any, clarity about exactly what reality the database mirrored. Control of variables is important, particularly in this case and in land commission valuation cases generally, because what is being attempted to be done is the measurement of the influence of "potentially influential variables".

27.    Here the variable(s) is/are the effect on property values and saleability of property caused by the placement of a powerline easement on property and the actual construction of powerlines. As Mr. Moore has noted in the statistical text he edited:

> "Correlation and regression describe the relationship between two variables. Often the relationship between the two variables is strongly influenced by other variables. We try to measure potentially influential variables. We can then use more advanced statistical methods to examine all of the relationships revealed by our data. Sometimes, however, the relationship between the variables is influenced by other variables that we did not measure or even think about. Variables lurking in the background, measured or not, often help to explain statistical associations.
> "A lurking variable is a variable that is not among the explanatory or response variables in a study and yet may influence the interpretation of relationships among those variables...A lurking variable can falsely suggest a strong relationship between X and Y, or it can hide a relationship that is really there...
> "Association is not causation. When we study the relationship between two variables, we often have to show that changes in the explanatory variable cause changes in the response variable. But a strong association between two variables is not enough to draw conclusions about cause and effect. Sometimes an observed association really does not reflect cause and effect.
> "An association between an explanatory variable X and a response variable Y, even if it is very strong, is not by itself good evidence that changes in X actually cause changes in Y.
> "The best way to get good evidence that X causes Y is to do an experiment in which we change X and keep lurking variables under control...When experiments cannot be done, finding the explanation for an observed association is often difficult and controversial. Many of the sharpest disputes in which statistics plays a role involve questions of causation that cannot be settled by experiment."

See "The Practice of Business Statistics Using Data for decisions", Ed. By Moore,

Mccabe, Duckworth and Alwan, New York: W.H. Freeman and Co., 2009.

16

28.     The Commission is bound by Judge Taylor's admonition in the *Instructions*. The Commission must consider the grounds upon which the witness bases his or her opinion and if they do not exist may disregard it. As far as the so called "studies" go the Commission has considered them and finds them deficient because of their failure to control their variables. In the Commission's view none of the proffered studies adequately controlled variables.  The Commission does not question their expertise, only the weight to be accorded such "studies".

29.     In this case, the Commission believes the assessment of value issue has two parts, using the method allowed in the *Instructions* of assessing the damage to the land as a whole. The first of these is what is the underlying value of the property.  The second is the amount of damage to the property as a whole. The landowners' appraiser assessed value at $36,000 per acre. The Government's appraiser assesses value at $28000 per acre.

30.     The comparables used by the various appraisers were extensive with the landowner's appraiser using twenty-one, several of which were assemblages and the Government's appraiser using eight. It is not necessary to list all of them as they are in the record. One sale or set of sales were used by both appraisers. This was  a sale of 30.5 acres on April 30, 2007 on York Road.  It is assemblage comparable number eleven in the Rogers report and sales number  three through seven in the Hall Report. Mr. Rogers assigns a value to the assemblage of $31,488 per acre and Mr. Hall assigns values ranging from $40,000 per acre to $27,300 per acre. One sale within both groups was almost exactly the same size as the subject. That is the Moon to York Road LLC sale of April 30, 2007 which conveyed 30.5 acres for $1,100,000 or

17

$36,065 per acre. The sale is one to one and a half miles from the subject, occurred three days before the date of take and has an almost identical size, i.e., 30.5 acres as compared to 30.79 acres for the subject. The value of this sale was also nearly identical to the per acre value assigned by Mr. Rogers. Given these factors the Commission deems this sale the most comparable sale.

31.    As a result the Commission partially credits Mr. Rogers' testimony as to the underlying value of the land. With regard to the comparables, as noted above, there was one notable common comparable sale used by both appraisers. The Commission deems it the most comparable sale and the best basis for underlying value. Based on this jointly used comparable the Commission credits the value testimony of Mr. Rogers as to underlying land value of $36,000 per acre. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." _United States v. 68.94 Acres of Land,_ 918 F.2d 389, 399 (3d Cir .1990); Unif. Appraisal Standards 47 (specifying nine "basic elements of comparison": property rights conveyed; financing terms; conditions of sale; market conditions; location; physical characteristics; economic characteristics; use and zoning; and non-realty components of value included in the sale property). The court's authority under Fed.R.Civ.P. 71A(h) to exclude evidence of sales of dissimilar properties is affirmed with regularity. "The questions of whether [comparable sales] transactions are near enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court." _Baetjer,_ 143 F.2d at 397. Since no two pieces of land are ever exactly

18

alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities…There is no basis, however, to rely on patently remote transactions when more comparable sales are available. *Cf. United States v. 100 .80 Acres of Land,* 657 F.Supp. 269, 274 n. 7 (M.D.N.C.1987)

32.    With regard to the assessment of damages, both to the easement area itself and incidental damages, the Commission credits Mr. Hall's method and percentages of damage. The Commission applies them to an underlying value of $36,000 per acre rather than $28,000 used by Mr. Hall. The Commission cannot credit Mr. Rogers assessment of 100% damage to the easement area as this is inconsistent with the *Instructions*.  The Commission is bound by the *Instructions* and cannot award 100% damages for an easement. The Commission would also point out that the proof was not conclusive that either open space development or traditional space development would not be able to accommodate using the land under the power lines, even if it were unlikely that open space would not be approved by the City of Nolensville. It required too many assumptions to get to the point that the land had no value after the take for the Commission to adopt that view, even if it were allowed to so rule by the *Instructions*. Likewise there is no substantiation for the proposition that the substation is a joint venture between TVA and MTEMC so as to allow damages for the affect of the substation on the subject. The damages for that take were compensation to another landowner in another case. The *Instructions* and relevant case law do not allow damages for a take on land which is not within the subject property. Mr. Rogers indicated in his testimony that he damaged the land next to the substation based on instructions from counsel to assess that. Even if damages from an adjacent take were

19

allowed based on a "joint venture" theory, there was no sufficient proof that a joint venture existed. TVA sells power to MTEMC. One is a seller. The other is a buyer. That does not make them joint venturers. The cooperation and coordination described only seems necessary because of the challenges and requirements of safely and efficiently transmitting high voltage electricity and connecting it to a large substation. Finally, the parties stipulated that there was only one tower on the subject property. It was apparent from the testimony of the landowner and the Government's appraiser that there was no stipulation as to that. Both testified that one of the two power poles at the southern end of the Clovercroft Substation was south of the fence and was considered to be on the Windrow property. The representation by the Government that the white circle at station 277 + 78.5 was the location of both towers was obviously not accurate, both from looking at  photographs 16. and 18. on pages 17 and 18 of the Rogers Report, (Exhibit 10); from looking at the drawing of the substation on the plan and profile map, (Exhibit 1); and from the testimony of Mr. Windrow and Mr. Hall, as well as the Commission's own observations at the view. There are two power poles and guy wires on the Windrow property within the easement.

33.     As noted above the Commission must make its own assessment of credibility. The Commission cannot accept all of any witness's assessment of damage. The Commission credits the underlying value of the land of $36,000 per acre opined by Mr. Rogers, based on the joint comparable used by Mr. Hall and Mr. Rogers and credits the percentages of damage to the easement area, incidental damage and guy wire damage  assessed by Mr. Hall. This yields damages of $64,596.60 to the

easement area, $29,700 to the 1.65 acre area to the east and $2,500 for guy wires for a total compensation due of $96,796.60.

34.     The Commission credits the assessment of all appraisers that there is diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." See, *Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 520 [6th] Cir. 1959). This analysis was affirmed *in United States ex rel. TVA v. Easement and Right-of-way*, 504 F.2d 305, 309 [6th] Cir. 1968). It must be demonstrated that there is an actual profitable use or a market demand for the prospective use. See, *United States v. Easement and Right-of-Way 100 Feet Wide*, 447 F.2d 1317, 1319 [6th] Cir. 1971). The Commission sees the Windrow property as developable property for the reasons stated above.

35.     It is further clear from the testimony of the witnesses that the land has this potential, i.e. residential development, in the reasonably near future. That potential may be used as a basis for a just compensation award. See, *U.S. ex rel. and for the use of TVA v. Hughes*, 251 F. Supp. 930 (E.D. Tenn 1966). The Commission also notes the subject property had all utilities available to it at the time of taking, either on site or very close by.

36.     Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their attorney, the Commission is of the opinion that the damages are as follows: damages to the exact area of the easement $64,596.60, incidental damages due to the 1.65 acre cutoff

irregular remainder $29,700; guy wire damages $2,500; total damages $96,796.60.

Hence the Commission respectfully reports that the just compensation due the landowner(s) is $96,796.60.

<div style="margin-left: 40%">

Respectfully submitted,

_____/s/William H. Farmer_____
William H. Farmer, Chairman

_____/s/Horace E. Johns_____
Horace E. Johns, Commissioner

_____/s/Jack W. Derryberry, Jr._____
Jack W. Derryberry, Jr., Commissioner

</div>

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Report of the Commission has been served by CM/ECF system to those registered and if not registered, via U.S. Mail, on this 23rd day of September, 2010.

<div style="margin-left: 40%">

By: _____s/ William H. Farmer_____

</div>